UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH J. BROOKS,

       Plaintiff,                  Civil Action No. 15-13272

           v.                  District Judge Sean F. Cox
                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Sarah J. Brooks ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On October 5, 2012, Plaintiff applied for DIB, alleging disability as of November 1, 2009 (Tr. 138-141). After the initial denial of her claim, Plaintiff requested an

administrative hearing, held on February 3, 2014 in Livonia, Michigan (Tr. 35). Administrative Law Judge ("ALJ") Mary Connolly presided.  Plaintiff, represented by attorney Dan Lee Smith, testified (Tr. 39-64), as did Vocational Expert ("VE") Dr. Lois P. Brooks (Tr. 64-66).  On March 25, 2014, ALJ Connolly found Plaintiff not disabled (Tr. 29-30).  On July 15, 2015, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed the present action on September 16, 2016.

## BACKGROUND FACTS

Plaintiff, born June 26, 1975, was 38 at the time of the administrative decision (Tr. 30, 138).  She graduated from high school and attended two years of college (Tr. 182).  She worked previously as a residential care provider and as a child care worker (Tr. 183).  She alleges disability as a result of a back injury, asthma, diabetes, anxiety, depression, and a learning disorder (Tr. 181).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She worked formerly as a child care giver and in a group home as an adult care giver for individuals with traumatic brain injuries (Tr. 40-41).  She worked in her home taking care of children until November, 2012 (Tr. 41).

Plaintiff experienced disabling back pain and asthma (Tr. 42).  She was placed in special education classes in school due to learning and emotional disabilities but was able to read (Tr. 43).  She experienced poor mathematical skills (Tr. 44).  She currently took Prozac

(Tr. 44-45). She had also received treatment and medication for anxiety (Tr. 46). Bouts of anxiety were characterized by breathlessness and fear (Tr. 47). Prozac created the side effect of suicidal ideation (Tr. 48). She experienced depression intermittently[1] (Tr. 49). The depression was characterized by crying jags and lack of motivation (Tr. 49-50). She experienced daily headaches and migraines approximately three times a week lasting between 5 and 48 hours (Tr. 51-52). None of her prescribed medicine resolved the migraines (Tr. 51). Migraines were characterized by blurred vision and faintness (Tr. 52).

Plaintiff's lower back pain radiated into her left leg (Tr. 52). Aside from the radiculopathy, she experienced the independent conditions of Achilles tendinitis and plantar fascitis of the left ankle and foot (Tr. 53). Her foot problems had worsened since breaking her foot one year earlier (Tr. 53). On a scale of 1 to 10, she experienced level "7" back pain (Tr. 54). She coped with pain by lying down and switching positions (Tr. 54). She had also been taking Percocet every day for two years even though it made her "loopy" (Tr. 55). Motrin 800 caused stomach upset (Tr. 55).

Plaintiff was unable to walk for more than half a block due to shortness of breath (Tr. 55). She was limited by constant back pain (Tr. 56). She could stand for up to 20 minutes before requiring a position change (Tr. 56). She was unable to sit for more than five minutes without a position change (Tr. 57). She was unable to lift more than five pounds (Tr. 58). Back pain and lack of motivation resulted in the need to lie down a total of 12 hours a day

---

[1]She later stated that she experienced depression daily (Tr. 50).

(Tr. 58-59). She performed household chores with the help of her nine-year-old son (Tr. 59-60). She experienced shortness of breath while performing laundry chores (Tr. 60). She engaged in the hobbies of reading, writing poetry, and playing Uno with her son (Tr. 61). She used a nebulizer for the condition of asthma (Tr. 61). Plaintiff did not attend many of her son's school activities because she no longer had a car (Tr. 62).

### B. Medical Evidence

#### 1. Records Related to Plaintiff's Treatment[2]

May, 1992 school records state that Plaintiff was eligible for special education due to an emotional impairment (Tr. 219). Plaintiff's academic weakness was identified as "immaturity" (Tr. 219).

February, 2011 University of Michigan Health System records created by Jennifer Castillo, M.D. state that Plaintiff returned for treatment after a six-month absence, requesting medication for anxiety (Tr. 854). Dr. Castillo's records from the following month note Plaintiff's report of headaches (Tr. 852). In May, 2011, Dr. Castillo prescribed Cymbalta for headaches (Tr. 850-851). Plaintiff reported headaches the following month (Tr. 848). Also in May, 2011, Plaintiff was diagnosed with sleep apnea (Tr. 843).

In October, 2011, Plaintiff reported that she stopped taking Cymbalta because her anxiety was "not bad" (Tr. 268). The same month, she was prescribed Vicodin and Flexeril

---

[2]Treatment for conditions unrelated to the arguments for remand have been reviewed in full, but are omitted from the present discussion.

-4-

for back pain (Tr. 279).   She denied headaches and exhibited a normal gait (Tr. 310-311). The following month, Plaintiff sought emergency treatment for an allergic reaction of throat swelling (Tr. 296, 298, 781).  She was found capable of returning to work on November 18, 2011 (Tr. 295).  December, 2011 records show that Plaintiff continued to take Prednisone (Tr. 359).  She denied headaches, but reported anxiety and continued back pain (Tr. 358). She exhibited a normal gait (Tr. 336).

In January, 2012, Plaintiff was prescribed Vicodin (Tr. 331).  Later the same month, she sought emergency treatment for headaches and abdominal pain (Tr. 946).  Blood work was unremarkable (Tr. 944).  She was released after her blood sugar levels were stabilized (Tr. 944).  The following month, Plaintiff denied current headaches (Tr. 321).  At the end of the same month, Plaintiff reported the current conditions of anxiety, asthma, depression, back pain, and headaches (Tr. 316-317).  In March, 2012, Plaintiff sought emergency treatment for leg swelling (Tr. 415, 937-938, 999, 1001).  She denied other health concerns (Tr. 937). Plaintiff reported that she had lost 47 pounds in the past year and now weighed 320 pounds with a goal of 225 (Tr. 937).  Imaging studies from the following month showed "clear" lungs (Tr. 929-930).  April, 2012 records state that Plaintiff failed to keep an appointment for an MRI of the spine (Tr. 993).

May, 2012 records state that Plaintiff walked "a lot" in her job as a nanny (Tr. 387). Imaging studies of the abdomen showed a gallstone (Tr. 363, 380, 768, 984).  Plaintiff sought emergency treatment later the same month for asthma (Tr. 495, 924).  An undated form

-5-

(created between December, 2011 and May, 2012) states that Plaintiff experienced 18 tender points consistent with a diagnosis of fibromyalgia (Tr. 1022).

In June, 2012, Plaintiff reported that asthma was worse at night (Tr. 488). She denied current headaches (Tr. 488). Treating notes state that she had an adverse effect from prednisone (Tr. 487). She was diagnosed with pneumonia (Tr. 467, 698). A chest x-ray was negative for active infiltration (Tr. 1054). The following month, Ashraf Uzzaman, M.D. found Plaintiff's asthma moderate to severe (Tr. 441-442). The same month, Plaintiff denied headaches (Tr. 439). In August, 2012, Plaintiff denied current shortness of breath and headaches (Tr. 514, 520, 528, 1051). She was re-prescribed Klonopin (Tr. 510). She exhibited a normal gait and muscle tone (Tr. 504).

In September, 2012, Plaintiff was diagnosed with kidney stones (Tr. 914, 606). She was prescribed Oxycodone (Tr. 595). Treating records include a form stating that Plaintiff experienced at least 11 of 18 tender points consistent with fibromyalgia (Tr. 593). Imaging studies of the left foot were negative for fractures (Tr. 981). She was referred for psychiatric counseling (Tr. 554, 610, 1025). The same month, intake records by Catholic Social Services note Plaintiff's report of significant symptoms of depression (Tr. 554). Plaintiff appeared fully oriented (Tr. 554). She was assigned a GAF of 58[3] (Tr. 557). At an October, 2012

---

[3]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*").

followup psychiatric examination, she reported crying on a daily basis (Tr. 560). The same month, Joseph B. Thompson, M.D. completed a "medical needs" form, stating that Plaintiff was unable to work for one year due to back pain, depression, anxiety, and asthma (Tr. 582-583). In November, 2012, Dr. Thompson found that Plaintiff was "at risk" for diabetic neuropathy (Tr. 570). The same month, Plaintiff underwent a laparoscopic cholecystectomy (gallbladder removal) without complications (Tr. 635-637).

A February, 2013 chest x-ray was unremarkable (Tr. 1065). In March, 2013, Plaintiff reported "major depression" (Tr. 418). Treating records note that she was fully oriented with a normal judgment and mood (Tr. 417). She denied recent headaches (Tr. 413). The following month, Plaintiff sought emergency treatment for asthma (Tr. 393). She reported that she experienced an exacerbation of asthma symptoms after "babysitting at a house that had 10 cats" (Tr. 967). A chest x-ray was normal (Tr. 971). A May, 2013 MRI of the lumbar spine showed a mild disc bulge at L4-L5 and "prominent epidural fat" narrowing the spinal cord at L5-S1 and resulting in moderate left and mild right stenosis (Tr. 863-864). Imaging studies of the left shoulder showed moderate tendinosis and sub-deltoid bursal fluid (Tr. 861). In September, 2013, Plaintiff requested a disability statement fom Dr. Castillo, stating she was unable to lift more than 10 pounds and experienced difficulty walking significant distances (Tr. 889). In June, 2013, Dr. Castillo recommended steroid injections for back and neck pain (Tr. 876). In October, 2013, Kenneth Silk, M.D. performed a psychiatric evaluation, noting depression and a borderline personality disorder (Tr. 895-896). He

-7-

assigned Plaintiff as GAF of 41-50[4] (Tr. 895).    In November, 2013, Plaintiff sought followup treatment after the removal of a plantar wart (Tr. 897).  Dr. Castillo noted that Plaintiff's lungs were clear (Tr. 897).  Dr. Castillo's December, 2013 records state that Plaintiff was "well-appearing" (Tr. 900).

In January, 2014, Dr. Castillo completed a Physical Residual Functional Capacity Questionnaire, noting shoulder problems and nerve root impingement of the lumbar spine (Tr. 857).  Dr. Castillo found that depression, anxiety, and psychological problems contributed to the physical symptoms (Tr. 858).  She found that Plaintiff was unable to sit or stand for more than five minutes at a time or walk for more than one city block (Tr. 858). She found that Plaintiff was unable to stand, sit, or walk for less than two hours in an eight-hour day and was limited to lifting less than 10 pounds on a rare basis (Tr. 859).  She found that Plaintiff was unable to perform *any* postural activities but could grasp and turn objects 50 percent of the time and perform fine manipulations without limitation (Tr. 860).  Dr. Castillo found that Plaintiff's conditions would require her to miss more than four days of work each month (Tr. 860).

### 2.  Non-Treating Records

In November, 2012, Donald H. Kuiper, M.D. performed a non-examining assessment of Plaintiff's physical conditions on behalf of the SSA, finding that she could lift 20 pounds

---

[4]A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

occasionally and 10 frequently; sit, stand, or walk for a total of six hours in an eight-hour workday; and push or pull without limitation (Tr. 76). He found that Plaintiff could balance on an unlimited basis; stoop, kneel, crouch, or crawl frequently; and climb stairs and ramps occasionally, but was precluded from all climbing of ladders, ropes, or scaffolds (Tr. 76). He found that Plaintiff should avoid concentrated exposure to temperature extremes and humidity, and avoid even moderate exposure to airborne hazards (Tr. 77).

In December, 2012, Thomas Martin Horner, Ph.D. performed a psychological examination on behalf of the SSA, noting Plaintiff's report of generally poor family relationships (Tr. 800). She reported difficulty during elementary and secondary school but noted that she went on to attend community college and obtain a certificate in desk top publishing (Tr. 800). She reported that she was not currently working due to her doctor's orders and because she was undergoing back therapy and being tested for lupus (Tr. 800). Plaintiff reported playing games, grocery shopping, writing poetry, using social media, and doing laundry (Tr. 801). Dr. Horner observed a normal affect and mood (Tr. 802). He noted a diagnosis of depression and the presence of physical problems and economic stressors, assigning Plaintiff a GAF of 58 (Tr. 803). He concluded as follows:

> [Plaintiff's] ability to relate positively, reciprocally and effectively with others, including coworkers, customers/clients, and supervisors is essentially intact. Her abilities to understand, remember and to carry out familiar or customary tasks is essentially intact. Her ability to focus and sustain attention to relevant and customary occupational tasks is similarly intact and operational. Ms. Brooks's ability to withstand or otherwise cope with stresses of ordinary or customary occupational activity is adequate except as affected by the aforesaid physical conditions. Outside of the actual physical health condition of which

she complains, [she] would be able and reasonably motivated to engage in work activity (Tr. 803).

The same month, Thomas T. L. Tsai, M.D. completed a non-examining evaluation of Plaintiff's mental condition on behalf of the SSA, finding that she was moderately limited in the ability to carry out detailed instructions and maintaining concentration for extended periods (Tr. 78). Dr. Tsai found that Plaintiff was capable of performing "simple," one or two-step tasks "on a routine and regular basis" (Tr. 78).

### C. Vocational Expert Testimony

VE Dr. Brooks classified Plaintiff's former work as both an adult caregiver and child care giver as exertionally medium and semiskilled[5] (Tr. 64). The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience:

> [S]he will be limited to sedentary work but would need a sit/stand option every 10 minutes; need to be unskilled; only mild concentration, pace, and persistence limitations; off task about [five percent] (Tr. 65).

In response, the VE testified that the above limitations would preclude Plaintiff's past relevant work but would allow for the work of an assembler (2,500 positions in the region

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

of Southeast Michigan); inspector (1,500); and packager (1,700) (Tr. 65). Dr. Brooks testified that if the limitations also included "a clean work work environment," the numbers would remain unchanged (Tr. 65). However, he testified that if credited, Plaintiff's testimony that she needed to recline at least twice a day for at least 30 minutes at unscheduled times and, needed to be absent from work at least three days a month would preclude all work (Tr. 66).

### D. The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease of the lumbar spine with radiculopathy; fibromyalgia; obesity; history of cholelithiasis/biliary colic, staus-post cholecystectomy; asthma; and diabetes mellitus" but that none of the conditions met or equaled any impairment listed in 20 C.R.F. Part 404, Subpart P, Appendix 1 (Tr. 17, 23). The ALJ found that the conditions of migraine headaches, obstructive sleep apnea, left toe fracture, and left rotator cuff tear were non-severe impairments (Tr. 18-19). She found that Plaintiff experienced mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 20-21). The ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> [S]edentary work . . . except that she requires a sit/stand option every 10 minutes; unskilled work; the ability to be off-task for five percent of the workday; and requires a clean work environment (Tr. 23).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform her past

relevant work, she could work as an assembler, inspector, or packager (Tr. 29).

The ALJ discounted Plaintiff's alleged degree of limitation, noting that she was able to care for her son and herself, read, write poetry, play cards, watch movies, socialize, and take her son on outings (Tr. 26). The ALJ observed that Plaintiff was able to work part time in 2011 and 2012 as a childcare worker requiring exertionally medium activity (Tr. 26). The ALJ observed that Plaintiff's claim that she had not worked since November, 2012 was undermined by emergency room records showing that Plaintiff was babysitting as late as March, 2013 (Tr. 27).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-13-

## <u>ANALYSIS</u>

### A.  The Mental Conditions

In her first argument, Plaintiff faults the ALJ's finding that she did not experience more than "mild" psychological impairment.   *Plaintiff's Brief*  9-16 (*citing* Tr. 19-21)*, Docket #17.*  She contends that the ALJ erred by finding at Step Two that the psychological impairments were "non-severe." *Id.* at 11.  Plaintiff  takes issue with the finding that the fairly sparse psychological treating records undermine the seriousness of her condition, arguing that in fact, her failure to seek regular mental health treatment is evidence of her mental limitations.  *Id.* at 11-12.

In Social Security parlance, a "severe" condition refers to any condition that would have more than a minimal effect on the claimant's work abilities.  *Farris v. Secretary of HHS,* 773 F.2d 85, 89-90 (6th Cir.1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)).   Finding that an impairment is "severe" is merely a *de minimis* hurdle intended to do no more than screen out groundless claims. See *Edlund v. Massanari,* 253 F.3d 1152, 1158 (9th Cir.2001).  Despite the low bar for qualification as a "severe" impairment, the omission of an impairment causing work-related limitations at Step Two is of "little consequence," provided that the ALJ considers "all impairments" in crafting the RFC. *Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 803, 2003 WL 21949797, * 1 (6th Cir. August 11, 2003).

-14-

In finding that the conditions of depression, anxiety, and a learning disability were non-severe, ALJ Connolly noted that the mental status findings were "minimal at best" (Tr. 19). She observed that the psychiatric findings generally showed that Plaintiff was fully oriented with a normal memory, insight, and mood (Tr. 20). The ALJ also supported the finding that Plaintiff experienced only mild limitation in daily living, social functioning, and concentration, persistence, or pace by noting that she was able to cook, clean, drive, shop, handle money, interact with others through social media, and socialize with friends (Tr. 21). The ALJ cited Dr. Horner's normal consultative psychological examination and Plaintiff's ability to concentrate and give appropriate testimony for the duration of the administrative hearing (Tr. 22).

Substantial evidence supports the conclusion that Plaintiff's psychological impairments were non-severe. As the ALJ noted, Dr. Horner concluded in December, 2012 that Plaintiff did not experience any significant level of work-related psychological impairment (Tr. 803). While the GAF of 58 regularly suggests moderate psychological limitation, Dr. Horner appears to factor Plaintiff's report of "economic stressors" and allegations of disabling physical problems into the GAF score (Tr. 803). Despite the treating records stating that Plaintiff experienced anxiety and depression, none of the emergency room records note a mood disorder.

Plaintiff's related argument that the ALJ erred by declining to credit Dr. Tsai's non-examining findings of moderate limitation in concentration is not well taken. First, to the

-15-

extent that it can be argued that Dr. Tsai found a greater degree of psychological restriction than Dr. Horner, the ALJ was entitled to adopt the consultative findings over the non-examining ones. Further, while the ALJ rejected Dr. Tsai's finding that Plaintiff had moderate limitations in the ability to perform detailed tasks, Dr. Tsai did not find significant limitation in the ability to simple tasks, concluding that Plaintiff was capable of simple, one or two-step tasks on a "routine and regular basis" (Tr. 78). Although somewhat more restrictive than Dr. Horner's conclusion, Dr. Tsai's findings are not inconsistent with the RFC for "unskilled work" (Tr. 23), which is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C.F.R. § 404.1568(a). Under SSR 85–15, unskilled work is limited to the ability "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."1985 WL 56857, *4 (1985). As such, while the ALJ rejected Dr. Tsai's finding of moderate concentrational limitations, the RFC for unskilled work is consistent with both Dr. Horner and Dr. Tsai's conclusions (Tr. 23).

The finding that Plaintiff's mental limitations were non-severe is otherwise supported by the record. In finding that the limitations in concentration, persistence, or pace were "mild," the ALJ observed that over the course of the 30-minute administrative hearing, Plaintiff was "coherent," "able to concentrate," and gave "technical medical answers" in response to questioning (Tr. 22). As the ALJ noted, Plaintiff's argument that she was unable

to perform even unskilled work is also undermined by her apparent ability to perform semiskilled work (on at least a part-time basis) well after the alleged onset of disability[6] (Tr. 26-28).

Plaintiff also disputes the ALJ's finding that the sporadic mental health treatment stands at odds with the allegations of significant psychological limitation. Citing *Blankenship v. Bowen,* she argues that her failure to seek regular mental health treatment was improperly used to undermine her claim of psychological limitation (Tr. 19). 874 F.2d 116, 1124 (6th Cir. 1989)("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"). However, *Blankenship* is distinguishable from the present case. Whereas Blankenship, suffering from schizophrenia, did not seek regular treatment for *either* the physical or psychiatric problems, *id.* at 1121-1124, current Plaintiff sought and received treatment on a regular basis for a plethora of other conditions. Indeed, the treating records for the period between February, 2011 and January, 2014 alone totals a staggering 800 pages, supporting the conclusion that Plaintiff was disinclined (rather than psychologically incapable) to submit to long-term mental health treatment.

---

[6]
While Plaintiff questions whether her past relevant work as a care giver (adult) or child care worker can be classified as semiskilled, *Plaintiff's Brief* at 8, her attorney at the administrative hearing did not dispute that the past relevant work was semiskilled (Tr.64). Plaintiff has provided no evidence to show that the past relevant work was less than semiskilled as characterized by the *Dictionary of Occupational Titles*.

Because substantial evidence supports the ALJ's conclusion that the mental impairments were non-severe, a remand on this basis is not warranted.

### B. The Treating Physician Analysis

Plaintiff argues second that the ALJ's rejection of Dr. Castillo's treating opinion lacks "any medical support." *Plaintiff's Brief* at 16-23. Plaintiff faults the ALJ's findings that the symptoms of respiratory problems, headaches, and back problems were "stable." *Id.* at 17 (*citing* Tr. 28). She also criticizes the ALJ's observation that the treatment was exclusively conservative, noting that the condition of fibromyalgia, by nature, requires conservative treatment. *Id.* She disputes that her asthma condition was stabilized and notes that the treating records reflect ongoing headaches. *Id.* at 19.

It is long established that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir.2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, *see Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir.2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2)). In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider

-18-

(1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir.2013); *Wilson v. CSS,* 378 F.3d 541, 544–546 (6th Cir.2004)(citing § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

As discussed above, in January, 2014, Dr. Castillo found that Plaintiff was unable to sit or stand for more than five minutes or walk for more than one city block (Tr. 858). She found that Plaintiff was unable to perform any postural activities (balancing, stooping, crawling, or crouching) and limited grasping and turning (Tr. 860). She found that Plaintiff's conditions would require her to miss more than four days of work each month (Tr. 860).

The ALJ accorded "little weight" to Dr. Castillo's opinion (Tr. 28). The ALJ supported her conclusion by noting that (1) Plaintiff's treatment had been exclusively "routine and conservative" for back problems, (2) the conditions of diabetes and asthma were

stable, (3) Plaintiff had made "minimal complaints of symptoms relating to . . . fibromyalgia and history of cholelithiasis," (4) she had engaged in a wide variety of activities on a regular basis since the alleged onset of disability, and (5) she had been able to work as a child care worker since the onset of disability requiring exertionally medium, semiskilled work (Tr. 25-26, 28).  The ALJ also referenced her earlier discussion of the treating records, noting that the condition of diabetes was stable and that the records between April and December, 2013 "reflect minimal complaints of pain . . . stemming from fibromyalgia (Tr. 26).  The ALJ correctly noted that the May, 2013 MRI of the lumbar spine showed "mild to moderate" abnormalities "at best" (Tr. 25, 863-864).  She noted that back surgery had not been recommended by any of the treating sources (Tr. 25).

The ALJ also cited emergency room records showing that as of September, 2012, the condition of asthma was stable and that Plaintiff did not experience an exacerbation of the condition until March, 2013 when symptoms were triggered after exposure to allergens (Tr. 26).  She found the condition of migraine headaches non-severe, noting that Plaintiff's claim of frequent, disabling headaches was supported only by subjective complaints (Tr. 18).  The ALJ permissibly observed that while Plaintiff alleged that the migraines began when she was a teenager, they did not prevent her from performing substantial gainful activity for many years (Tr. 18).  The ALJ's analysis is consistent with my own review of the treating records showing that Plaintiff denied headaches on numerous occasions (Tr. 310-311, 321, 358, 455, 514).

-20-

Because the ALJ's reasons for rejecting Dr. Castillo's opinion are well supported and well articulated, the treating physician analysis should remain undisturbed.

## C. The Credibility Determination

Last, Plaintiff disputes the finding that her allegations of limitation were not credible. *Plaintiff's Brief* at 23-25 (*citing* Tr. 26-28). She argues that the ALJ over-relied on the activities of daily living in finding that she was capable of full-time employment. *Id.* (*citing Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir. 1967), *Rogers v. CSS,* 486 F.3d 234, 249 (6th Cir. 2007)).

It is well established that "'[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments.'" *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542–43 (6th Cir. 2007)(*citing Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 532 (6th Cir. 1997)). As such, the ALJ did not err in noting that Plaintiff's ability to work on at least a sporadic basis, seek companionship online, socialize, perform household chores, and care for her own personal needs and those of her nine-year-old son undermined the disability claim (Tr. 26). Plaintiff cites *Walston,* 381 F.2d at 586 which states that the ability to perform household chores and other activities on a intermittent basis does not equate with the "ability to engage in substantial gainful activity." However, the ALJ did not err in concluding that Plaintiff engaged in these activities on a regular rather sporadic basis. Plaintiff acknowledges, in effect, that she is able to take care of her son without help but cites *Gentle v. Barnhardt,* 430 F.3d 865, 867 (7th Cir.

-21-

2005) for the proposition that caring for a child cannot be equated with full-time work. *Plaintiff's Brief* at 14.   However, the ALJ did not reject Plaintiff's allegations on the sole basis that she could take care of her son, but instead, that the child care responsibilities, along with her other diverse and regular activities, supports the conclusion that she was physically and psychologically able to perform sedentary, unskilled work (Tr. 26).   The ALJ also noted that "during the hearing," Plaintiff was "coherent and able to concentrate on questions asked of her, even giving technical medical answers to questions suggesting at least average ability in mental functioning" (Tr. 22).   "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse, supra*., 502 F.3d at 542 (6th Cir.2007) (*citing Walters*, 127 F.3d at 531.   Anderson v. Bowen, 868 F.2d 921, 927 (7th Cir.1989) (citing Imani v. Heckler, 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

In closing, this Court's finding that the administrative decision should be upheld is not intended to trivialize legitimate limitations resulting from the physical conditions.   However, based on a careful reading of this record, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative level.   Pursuant to *Mullen v. Bowen*, *supra*, the ALJ's decision should not be disturbed by this Court.

**CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
**HON. R. STEVEN WHALEN**
UNITED STATES MAGISTRATE JUDGE

Dated: November 2, 2016

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document was sent to parties of record on November 2, 2016, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen